IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:19-CR-220-TAV-DCP |
| | ) | |
| BRYAN CORNELIUS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATON**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Bryan Cornelius's Motion to Suppress Intercepted Communications by Wiretap [Doc. 242] and Defendant Gage Whittenberg's Motion to Adopt Motion to Suppress Intercepted Communications by Wiretap [Doc. 247]. In summary, Defendant Cornelius alleges that suppression is required because the Government failed to satisfy the necessity requirement as required by 18 U.S.C. § 2518(1)(c). Defendant Whittenberg states that he is similarly situated and asks to adopt the motion and supporting memorandum [Docs. 242 and 243]. The Government filed a response in opposition [Doc. 252].

On December 4, 2020, the Court conducted a hearing on the motion.[1] Assistant United States Attorney Cynthia Davidson appeared on behalf of the Government. The following attorneys appeared on behalf of the Defendants: Norman D. McKellar for Bryan Cornelius and Forrest L.

---

[1] The Court also heard Defendant Whittenberg's Motion for Bill of Particulars [Doc. 245] and Motion for Disclosure of Specific Items Pursuant to Brady [Doc. 246], which will be addressed by a separate order.

Wallace for Gage Whittenberg. At the conclusion of the hearing, the Court took the matter under advisement.

For the reasons set forth herein, the Court recommends that Defendant Whittenberg's Motion to Adopt [**Doc. 247**] be **GRANTED** and that Defendant Cornelius's motion to suppress [**Doc. 242**] be **DENIED**.

## I.  POSITIONS OF THE PARTIES

Defendant Cornelius asks the Court to suppress all statements and information obtained through the wiretap, because the Government failed to satisfy the necessity requirement as required by 18 U.S.C. § 2518(1)(c). [Doc. 242 at1]. Defendant Cornelius states that while Federal Bureau of Investigation Task Force Officer Kristopher Mynatt's ("Officer Mynatt") affidavit alleges that the probable cause is based on eight controlled buys by a single confidential source ("CS-1") over a four-month period, the affidavit fails to make a full and complete statement of whether other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed or to be too dangerous. [Doc. 243 at 1-2]. Defendant Cornelius maintains that the affidavit merely recites generalizations for typical narcotics cases and is conclusory, giving no specifics on the circumstances of this particular case. [*Id.* at 2].

In addition, Defendant Cornelius asserts that the affidavit relies on material misstatements and omissions on necessity and that once those misstatements are removed, the affidavit is void of independent verification of why the wiretap was necessary. First, he argues that the affidavit includes misleading statements on physical surveillance in this case. He notes that although the affidavit states physical surveillance has been and will continue to be conducted, the only surveillance used is a single pole camera outside of 6632 Wachese Lane. [*Id.* at 2-3]. Next, he maintains that while the affidavit describes information about the activity of the drug trafficking

2

organization ("DTO") outside of the surveilled residence of 6632 Wachese Lane, it gives no reason to believe continued use of the pole camera and adding actual physical surveillance would not produce useful information. [*Id.*]. Then, Defendant Cornelius argues that the affidavit misleads the issuing judge (District Judge Varlan) to believe agents have conducted physical surveillance of him (Cornelius), when the only basis for the wiretap is CS-1. [*Id.* at 3]. He points out that the affidavit admits CS-1 engaged in unauthorized criminal activity during the investigation and notes concern regarding CS-1's long-term usefulness due to past drug-use and the possibility of relapse. [*Id.*]. In addition, Defendant Cornelius argues that CS-1 had limited interactions with him compared to the other targets and that much of the stated facts establishing probable cause with regard to Defendant Cornelius was based on "[Officer Mynatt]'s uncorroborated beliefs and opinions as to the organization of the DTO and Mr. Cornelius' alleged role." [*Id.* at 4].

Finally, Defendant Cornelius asserts that aside from pen registers, the remaining information on necessity is conclusory in that Officer Mynatt's opinions on the ineffectiveness of undercover agents, search warrants, interviews, grand jury subpoenas, immunity, trash searches, covert surveillance cameras, tracking devices, cell phone location information, financial investigations, and mail cover requests are not corroborated. [*Id.* at 3]. He maintains that with only limited evidence from CS-1 and pen registers, "the government improperly used the wiretap as the true first step in its investigation." [*Id.* at 4].

Defendant Whittenberg adopts the arguments of Defendant Cornelius, stating he "agrees with co-defendant Cornelius' motion, as he is similarly situated." [Doc. 247 at 1].

The Government responds that the Title III Order for the subject wiretaps complies with 18 U.S.C. §§ 2510 *et seq.*, and the affidavit in support of the Title III Order demonstrates both probable cause and necessity. [Doc. 252 at 1]. The Government argues that the affidavit

3

establishes that an extensive investigation preceded the wiretap application, but despite law enforcement's efforts, the goals of the investigation into the DTO had not been met. [*Id.* at 5]. As delineated in Officer Mynatt's affidavit, the goals of the investigation included:

- discovering the full scope and identities of key personnel involved in illegal drug trafficking on behalf of WHITTENBERG, CORNELIUS, and the DTO;
- discovering the identities and roles of suppliers of cocaine, methamphetamine, heroin, and/or other drugs or controlled substances to the identified co-conspirators;
- discovering the identity of the main customers of WHITTENBERG and CORNELIUS;
- discovering the stash locations where cocaine, methamphetamine, heroin and/or other drugs are stored prior to distribution;
- discovering the management and disposition of proceeds generated by the DTO's narcotics trafficking; and
- obtaining admissible evidence which demonstrated beyond a reasonable doubt that WHITTENBERG, CORNELIUS, and other Target Subjects, and any later identified targets, have committed or are committing the violation of the laws alleged herein.

[Doc. 243-1 at ¶ 66].[2] Officer Mynatt states that the goals will not be achieved unless the whole supply chain is dismantled. [*Id.*at ¶ 67]. He further states that despite learning important aspects of the composition and activities of the DTO, certain critical aspects remain unknown, including "the primary suppliers to WHITTENBERG and CORNELIUS, the methods and means of the trans-shipment of [drugs] into the Knoxville area . . . [and] of drug proceeds to the [drug] suppliers, the full, comprehensive methods and means of [drug] distribution in Knoxville and the surrounding counties, and the methods and means of laundering drug proceeds, to include the identification of significant assets." [*Id.*].

The Government asserts that the affidavit demonstrates that the DTO is a "violent drug trafficking criminal enterprise that was routinely relying on their cellular phones to conduct their

---

[2] The affidavit of Officer Mynatt was submitted as an exhibit by both Defendant Cornelius [Doc. 243-1] and by the Government [Doc. 252-1]. As the first reference to the affidavit was made by Defendant Cornelius, all references will be to Doc. 243-1.

4

drug trafficking business," and that it shows serious consideration was given to other investigative techniques in context of the stated goals. [Doc. 252 at 5-6]. Officer Mynatt states that the goals of the investigation could not be achieved by the pre-wiretap techniques for several reasons, including that physical surveillance had been and would continue to be conducted but that prolonged or regular physical surveillance would risk detection and compromise the investigation; that counter-surveillance measures had been taken by the Target Subjects[3]; that a pole camera had been used at a DTO member's house and while helpful, could not accomplish the stated goals of the investigation; that CS-1 had been used for multiple controlled purchases and CS-1's phone had been consensually recorded, but all participants of the ongoing conspiracy remained unidentified, including the major DTO suppliers; and that toll history and pen registers/trap and trace information had been obtained, but information consisted of a list of phone numbers, which was of limited value and would not accomplish the investigative goals. [*Id.* at 7].[4] The Government notes that the affidavit also explains that other non-wiretap techniques such as vehicle trackers, search warrants, subject interviews, trash pulls, and mail covers were considered, but were determined insufficient to accomplish the goals of the investigation and, in some cases, deemed too dangerous or too risky to the investigation. [*Id.*].

The Government argues that law enforcement is not required to attempt every possible non-wiretap investigative technique before seeking a wiretap authorization, but only to "give serious consideration to the non-wiretap techniques prior to applying for wiretap authority," and

---

[3] The affidavit defines the "Target Subjects" as Defendants Cornelius and Whittenburg; Codefendants Mobley, Chatman, Bassett, Williams; and unindicted alleged co-conspirators Christopher Gilmore, Regge Leatherwood, Trevelle Baylis, and Anthony Baylis. [Doc. 243-1 at 7].

[4] The Court has compiled the argument set forth in page seven of the Government's response, as well as the remaining information on this topic set forth in Officer Mynatt's affidavit.

explain "the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." [*Id.* at 7-8]. The Government further argues that Officer Mynatt's affidavit satisfies these requirements and that District Judge Varlan's decision to grant the application for the wiretap should be accorded great deference. [*Id.*].

## II.    BACKGROUND

On December 17, 2019, Defendants Cornelius and Whittenberg ("Defendants") were charged in a two count Indictment with distribution of methamphetamine on July 12 and August 23, 2019. [Doc. 4]. On February 5, 2020, a Superseding Indictment [Doc. 24] was returned charging them as well as numerous other defendants with multiple drug conspiracies in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), possession with intent to distribute methamphetamine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 841(b)(1)(D), and firearm offenses under 18 U.S.C. §924(c)—in addition to the original two distribution counts. Defendant Whittenberg is also charged with assaulting or impeding Federal Bureau of Investigation ("FBI") Special Agents in performance of official duties, by shooting at agents with a firearm in violation of 18 U.S.C. § 111(a) and (b).

As part of its investigation, the Government applied for and obtained a court order authorizing a Title III wiretap, submitting Officer Mynatt's affidavit. [Doc. 243-1 at 1]. His affidavit for the October 23, 2019 wiretap application, which is 81 pages in length, sought authorization from District Judge Thomas Varlan to intercept electronic communications occurring to and from three cellular telephone numbers, including (865) 456-8798, subscribed to by "'Jeneca Mobley' . . . and is being used by [Defendant] Whittenberg"; (865) 443-5338, subscribed to by "'Gray Bush' . . . and is being used by [Defendant] Cornelius"; and (865) 244-

5176, subscribed to by "'Jalayah M. Manning' . . . and is being used by [Defendant] Cornelius." [*Id.* at 4-5]. In the affidavit, the named Target Subjects include Defendants, among others. [*Id.* at 10]. The communications target a drug trafficking conspiracy involving cocaine, methamphetamine, and heroin.[5] [*Id.* at 7]. An order authorizing the interceptions of the relevant wire communications was signed by District Judge Varlan on the same day Officer Mynatt signed the affidavit.[6] *See* 3:19-MC-5012. Defendants were indicted on December 17, 2020, based in part on evidence from the wiretap.

In Officer Mynatt's affidavit supporting the application for the October 23, 2019 Order authorizing the subject wiretaps, he sets out his qualifications as a law enforcement officer and affiant and the grounds for seeking the wiretap authorization, and the fact that no prior applications for wiretaps have been sought related to the three target telephones or any of the Target Subjects. [Doc. 243-1 at 1-10, 56]. It describes the information expected to be obtained from intercepting communications from the target phone numbers, including identifying information of "associates of the Target Subjects . . . drug suppliers(s) [sic], significant drug customers, drug transporters and straw purchasers of assets . . . the leadership of the drug trafficking organization…, and the nature, scope, places, and methods of operations." [*Id.* at 8]. The affidavit states that "[n]ormal

---

[5] The enumerated offenses included: distribution and possession with intent to distribute controlled substances, and conspiracy to distribute and to possess with intent to distribute controlled substances, including cocaine, methamphetamine, and heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846; use of a communication facility (telephone) to commit, or facilitate the commission of drug trafficking activity, in violation of 21 U.S.C. §§ 843(b); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956; and aiding and abetting the named offenses in violation of 18 U.S.C. §2. [Doc. 243-1 at 7].

[6] Judge Varlan entered an order authorizing the wiretap's renewal on November 22, 2019. *See* 3:19-MC-5012.

investigative procedures have been tried and have failed, or were only marginally successful, appear unlikely to succeed if tried, or are too dangerous to employ[.]" [*Id.*].

The affidavit then details the background of the target subjects and provides an overview of the drug investigation [*Id.* at 10-12], including the information already known to law enforcement uncovered through conventional means, such as the use of CS-1, who had been a customer of several of the Target Subjects for a year or more, including Defendant Whittenberg, and who was personally acquainted with Defendant Cornelius. The affidavit references that agents supervised CS-1 making numerous controlled purchases of cocaine, methamphetamine, and heroin from various Target Subjects, including Defendants, and supervised several recorded telephone conversations, text messages, and direct meetings between CS-1 and numerous Target Subjects, including Defendants. [*Id.* at 17]. Officer Mynatt notes that CS-1 is a drug abuser, who is cooperating with law enforcement in return for consideration on a potential pending state charge, but states that the information CS-1 provided about the DTO has never been false or misleading and was "corroborated by information obtained from various law enforcement databases, physical surveillance, through controlled drug purchases, toll/pen-trap records, and consensually-recorded meetings, and phone calls and text messages that CS-1 had with many of the Target Subjects." [*Id.* 17-18]. He further attests that CS-1 is not able to provide full information that would identify all participants of the conspiracy or the scope of the DTO, specifically noting that the major DTO suppliers remain unidentified. [*Id.* at 59]. Additionally, Officer Mynatt points out that CS-1's continued assistance in the investigation depends on his ability to remain drug free. [*Id.* at 60]. The affidavit also details the investigative findings resulting from toll record and pen register analysis, as well as toll analysis of calls and/or SMS text messaging on the target phones. [*Id.* at 50-55].

With respect to the need for interception, the affidavit states that Officer Mynatt believes that original interceptions of communications over target phones "will enable the government to positively identify the Target Subjects, their suppliers, all or a significant number of their customers and associates, and significant assets, all of which will further the goals and objectives of this investigation." [*Id.* at 56]. The affidavit further notes that the current state of the investigation would position the Government to successfully prosecute only the lower-level portion of the DTO and that intercepting wire communications will enable agents to "identify higher-level suppliers to WHITTEBERG and CORNELIUS . . . [and] all or a majority of the most culpable participants of this DTO." [*Id.* at 58]. Officer Mynatt explains that the requested interceptions, combined with future Title III authority to intercept phones used by higher-level suppliers, "will enable agents to identify all or a majority of the most culpable participants of this DTO"—leading to the eventual dismantling of the entire DTO and seizure of assets. [*Id.*].

Officer Mynatt includes an explicit discussion of other alternative techniques of investigation, namely: physical surveillance; undercover agents; search warrants; interviews/grand jury subpoenas/immunity; trash searches; and attempted use of other surveillance techniques, including covert surveillance cameras, vehicle tracking devices, real-time location information from cellular phones, pen registers/trap and trace devices, financial investigations, and mail cover requests, noting that each method has either been tried and failed or of limited success, appeared unlikely to succeed, or was considered too dangerous to employ. [*Id.* at 60-76]. As to physical surveillance, the affidavit states that "physical surveillance has been and will continue to be conducted" but that it has "proven to be difficult due to DTO's use of various locations, some known and unknown." [*Id.* at 60–61]. It describes the use of a covert pole camera outside of 6632 Wachese Lane, a residence located at the end of a dead-end street, stating information obtained is

limited due to such things as: the distance of the camera making positive identification of the subjects coming and going from the residence extremely difficult; tag information obtained from several vehicles observed has been related to rental vehicles "and often those are rented in the names of others;" and most people park in the rear of the residence and out of view of the pole camera. [*Id.*]. Despite its limited success, the affidavit explains that physical surveillance will likely play an "important role in the take-down phase of this investigation once all significant co-conspirators have been identified and evidence of their involvement in the conspiracy has been established," but at the current phase of the investigation, not enough evidence has been developed to achieve the goals, "and physical surveillance, even combined with other law enforcement techniques and evidence gathered thus far, is insufficient to achieve those goals at this time." [*Id.* at 62].

In discussing other alternative traditional investigative techniques, the affidavit details that the use of uncover agents ("UCA") normally requires a CS introducing the UCA to the Target Subjects. [*Id.* at 62]. Officer Mynatt states that in his opinion, CS-1, who is able to make buys, could not successfully introduce a UCA to the Target Subjects to do anything more than make additional controlled drug buys. [*Id.*]. He explains that the Target Subjects are either "confirmed members or close associates of the Gangster Disciple Street Gang" and that to obtain information about the structure and activities of the DTO, he believes a UCA would likely be requested to perform activities that are too dangerous or illegal, such as to use or sell drugs or participate in illegal drug trafficking and money laundering." [*Id.* at 62-63].

Additionally, the affidavit discusses search warrants having not yet been executed as part of the investigation because of the DTO's transient nature of operations, the unknown identities of the sources of supply, and unknown locations of stash houses. [*Id.* at 64-65]. Officer Mynatt

explains his belief that information obtained from the wiretap intercepts will assist in identifying other locations such that "the use of search warrants on all identifiable locations will have greater success in dismantling the DTO." [*Id.* at 64]. With respect to interviews or a grand jury investigation, the affidavit discusses why they have not been utilized at that point, and why they would not achieve the goals of the investigation. Moreover, it explains how attempted interviews and service of grand jury subpoenas upon persons involved in the DTO could also risk compromise of the investigation. [*Id.* at 66-67].

In addressing trash searches, the affidavit notes that they would be of limited value and not worth the risk of detection. [*Id.* at 67]. The affidavit specifically discusses potential issues with attempting such searches at locations under investigation. For example, it states that at the 6632 Wachese Lane residence, the pole camera used in surveillance has never detected trash being discarded from the residence and that it is unknown how the trash is removed. [*Id.* at 68]. The affidavit further explains that at 603 Tate Street, Rockwood, Tennessee, where drugs have been obtained from the DTO, "there are surveillance cameras located on the outside of the residence providing coverage of the street and other areas of the exterior of the residence," therefore attempts to collect trash would be noticed and potentially alert DTO members to the investigation. [*Id.*]. In addition, the affidavit notes that it is unlikely any useful evidence would be found at the 4235 Plummer Road residence because Defendant Whittenberg has taken steps to separate that location from his illegal activity. [*Id.*]. Finally, Officer Mynatt states that based on his training and experience, "it is highly unlikely that examination of discarded trash would reveal the scope of the overall DTO or provide information regarding the drug suppliers or distributors." [*Id.* at 69].

In regard to attempted use of other surveillance techniques, Officer Mynatt explains his belief that the use of covert surveillance cameras or the expanded use of the cameras would not

achieve the goals of the investigation, because of the methods the Target Subjects employ to distribute drugs to their customers. [*Id.*]. First, he states that law enforcement's observation of drug transactions is impaired due to the Target Subjects' use of residential homes to conduct drug transactions, where customers park and walk behind the residences for a short period of time and then leave, followed shortly afterwards by the Target Subjects. [*Id.* at 69–70]. Next, he explains that at least one controlled buy was conducted in the parking lot of an open business located in a densely populated area making physical surveillance difficult. [*Id.* at 70]. Then, Officer Mynatt goes on to explain that the use of vehicle tracking devices had also been contemplated, but that the risk of detection was determined to outweigh the potential value. He notes that the "Target Subjects' use of passenger vehicles is not fully known," that agents could not learn from such devices how movements of a targeted vehicle specifically relate to the DTO, and that "several of the Target Subjects have been observed operating different vehicles, to include rental cars and cars registered to other people." [*Id.* at 70-71]. Finally, Officer Mynatt addresses the use of court-authorized, real-time location information for cellular phones. He discusses that while there is no risk associated with obtaining the information, it is most valuable when used in conjunction with wiretaps indicating when a drug transaction is about to occur and establishing physical surveillance of the transactions. [*Id.* at 71].

In terms of other investigative techniques, the affidavit also discusses pen register/trap and trace devices, toll record analysis, subscriber information, financial investigations, and mail cover requests. [*Id.* at 74-76]. With respect to pen registers/trap and trace and toll information, Officer Mynatt states that they have been and would continue to be used in the investigation, but the information "has not established the identities of all the persons called or the contents of the conversations." [*Id.* at 74]. Further, he states that there was little or no meaningful subscriber

12

information on the Target Telephones, which was typically the case with phones used by drug traffickers. [*Id.*]. With regard to a financial investigation, Officer Mynatt states that he and other FBI personnel are conducting such an investigation of the Target Subjects, but that "[it] is expected to complement the drug investigation, not take its place." [*Id.* at 75]. At the time of the affidavit, Officer Mynatt states that "drug trafficking business operates on a cash-basis," that "it appears that the DTO does not utilize any sort of sophisticated money laundering techniques," and that a full financial investigation is impossible because not all members of the DTO have been identified. [*Id.*]. Lastly, Officer Mynatt discusses mail cover requests, and states that "[t]here is no indication that any subject of the investigation is using the mail to conduct drug trafficking or other criminal business." [*Id.* at 76].

## III.    ANALYSIS

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.*, governs the interception of oral and electronic communications.   Interception of oral and electronic communications is generally prohibited, 18 U.S.C. § 2511, and no communication, or evidence derived from such communication, that is intercepted in violation of Title III may be used as evidence at trial, 18 U.S.C. § 2515.  However, the Government may apply to a district judge for the interception of a wire or oral communication, and the judge may order, in conformity with § 2518, the interception of oral and /or electronic communications by a federal investigating agency for evidence of drug trafficking crimes.  *See* 18 U.S.C. § 2516 (1)(e).

As with search warrants generally, the judge authorizing a wiretap must find "probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense[,]" such as drug trafficking.  18 U.S.C. § 2518(3)(a); *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988) (holding that the "basic standards for a wiretap are similar to those for a

search warrant, but there also must be strict compliance with Title III").  The judge must also find "probable cause for belief that particular communications concerning that offense will be obtained through such interception[,]" that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[,]" and probable cause to believe that the telephones from which the communications are to be intercepted are being used in connection with the offense or are commonly used by the suspected individual.  18 U.S.C. § 2518(3)(b)-(d).

A valid authorization is presumed unless an "aggrieved person" challenging the electronic surveillance makes a prima facie showing that it was not so authorized.  *See* 18 U.S.C. § 2510(11) (defining "aggrieved person" as someone who was a party to any intercepted communication or a person against whom the interception was directed).  "Any aggrieved person in any trial, hearing, or proceeding in or before any court . . ., may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—"

> (i)    the communication was unlawfully intercepted;
>
> (ii)    the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
> (iii)    the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10).

The Court notes that in a case in which law enforcement obtained a search warrant, the defendant bears the burden of proving the constitutional violation.  *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979).  The same is true with regard to Title III wiretaps: "'[A] wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this

presumption.'" *United States v. Kelley*, 596 F. Supp. 2d 1132, 1143 (E.D. Tenn. 2009) (quoting *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995)).

In turning to the substance of the instant motion, Defendants seek to suppress all evidence obtained as a result of the interception of the subject wiretaps on the basis that the application and order authorizing the wiretap do not meet the necessity requirement of 18 U.S.C. § 2518. The Government maintains that the Title III Order complies with 18 U.S.C. § 2510 *et seq.*, and the affidavit in support of the Title III Order demonstrates necessity. The Government further argues that even if the affidavit is deemed defective in showing necessity, suppression is not appropriate under *Herring v. United States*, 555 U.S. 135, 136 (2009). [Doc. 252 at 3-4].[7]

As previously detailed, Defendants assert that Officer Mynatt's affidavit in support of the wiretap application fails to make a full and complete statement of whether other investigative procedures had been tried and failed or reasons as to why other techniques reasonably appear unlikely to succeed. They argue that the affidavit contains merely generalized language of necessity for typical narcotic cases and is conclusory, giving no specifics on the circumstances of this case. They further claim the affidavit relies on material misstatements and omissions as to necessity.

---

[7] As the Court has not found that the Title III affidavit is defective in necessity, the Court will decline to address in great detail the Government's arguments regarding the application of *Herring*. The Court notes, however, that in *United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007), the Sixth Circuit held that "the good faith exception to the warrant requirement is not applicable to warrants obtained pursuant to Title III." Courts citing *Rice* have uniformly acknowledged that the Sixth Circuit declined to extend the good faith exception to Title III wiretap cases. *See, e.g.*, *United States v. Barajas*, 710 F.3d 1102, 1110 n.4 (10th Cir. 2013); *United States v. Spann*, 409 F. Supp. 3d 619, 624 (N.D. Ill. 2019); *United States v. Montgomery*, 290 F. Supp. 3d 396, 415 (W.D. Pa. 2018); *United States v. Houston*, No. 1:13-CR-37, 2015 WL 1061971, at *12 n.7 (E.D. Tenn. Mar. 11, 2015).

15

The Title III necessity requirement protects against the use of a wiretap as the initial step in an investigation. "This provision, commonly referred to as the 'needs statement provision,' was designed to insure that wiretapping is not resorted to in a situation where traditional investigative techniques 'would suffice to expose the crime.'" *United States v. Young*, 847 F.3d 328, 343 (6th Cir. 2017) (quoting *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988)). There is not a requirement, however, that the "government . . . prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163 (citing *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir. 1985)). Rather, as the Sixth Circuit has stated:

> All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate. While the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be . . . inadequate compliance with the statute.

*United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007). The Sixth Circuit has further declared that the Title III necessity requirement "do[es] not require proof of the absolute impossibility of all other means. Instead, a reasonable statement of the consideration or use of other investigative means is adequate . . . ." *Alfano*, 838 F.2d at 164.

"In order to conduct electronic surveillance using a wiretap, federal law enforcement officials must secure authorization by making an application containing 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Young*, 847 F.3d at 343 (quoting 18 U.S.C. § 2518(1)(c)). "'[W]hat is needed is to show that wiretaps are not being

16

routinely employed as the initial step in criminal investigation.'" *Id.* (quoting *Alfano*, 838 F.2d at 163) (cleaned up).[8]

"Because the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must be suppressed." *Rice,* 478 F.3d at 710. However, "a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption." *Kelley*, 596 F. Supp. 2d at 1143 .

In its analysis, the Court will first address Defendants' general contention regarding lack of necessity and then turn to Defendants' argument that the affidavit relied on material misstatements and omissions on necessity.

### A. Necessity

The issuance of a wiretap requires "no specific formula," and the "evidence must be judged on the totality of the circumstances[.]" *Alfano*, 838 F.2d at 161 (citation omitted). Whether an application satisfies § 2518(1)(c) must be determined "'in a practical and common sense fashion.'" *Rice*, 478 F.3d at 717 (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)). An application relying on purely conclusory statements and not showing any factual relations to the case would be insufficient. *Landmesser*, 553 F.2d at 20. Here, such is not the case as the affidavit sufficiently discusses the considerations of other investigative procedures as they relate to the case at hand. The fact that Officer Mynatt's affidavit relies in part on some general statements of his prior experience with certain non-wiretap investigative techniques in drug trafficking cases does

---

[8] *See United States v. Joiner*, 727 F. App'x 821, 827 (6th Cir. 2018) (using "cleaned up" parenthetical to remove internal quotations and alterations to the language of the cited opinion).

not render the application insufficient. *Id.* (finding the "mere fact that the affidavit . . . rested in part on statements that would be equally applicable to almost any . . . case [of this kind] does not render the affidavit insufficient" so long as there is "information about particular facts . . . which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation") (internal quotation marks and citations omitted); *see, e.g.*, *United States v. Wright*, 635 F. App'x 162, 167 (6th Cir. 2015).

As required, the affidavit informs the issuing court of the reasons law enforcement believes that other traditional investigative techniques, which need not include every imaginable method, "have been or will likely be inadequate." *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985). In the background previously detailed, Officer Mynatt explains his view as to the need for wiretap interception as well as the evidence he expects to obtain through the interceptions. With respect to various other investigative techniques, Officer Mynatt discusses why, in his opinion, each had been or would be inadequate in this case, including specifics about the investigation of Defendants' alleged DTO. *See Wright*, 635 F. App'x at 167 ("Upon reviewing these affidavits, we are convinced that SA Porrini offered case-specific examples as to why traditional surveillance techniques would not achieve the goals of the investigation, contrary to Colbert's assertion of 'boilerplate' language.").

Contrary to Defendants' assertions, sufficient information is set forth in the affidavit to comply with the necessity requirement, and Defendants have not met their burden to overcome the presumption that the wiretap authorization signed by District Judge Varlan is proper. While law enforcement had attained some level of understanding as to the DTO through the use of CS-1 and controlled buys, such did not preclude them from seeking and obtaining authorization for wiretaps. *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) ("[T]he mere fact that some

investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance.").  The Sixth Circuit has observed that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation," and this investigation involved such an enterprise.  *Id.* at 305 (quoting *Landmesser*, 553 F.2d at 20).

In this case, the affidavit provided to District Judge Varlan as the basis for the wiretap application is sufficiently detailed and includes more than just generalized statements about drug trafficking organizations.  Not only does Officer Mynatt reference his training and experience to support his discussion of reasons for his belief that other investigative techniques have been or will likely be inadequate, he also includes "particular facts of the case at hand, which would indicate that a wiretap is not being 'routinely employed as the initial step in criminal investigation.'" *Landmesser*, 553 F.2d at 20 (citing *United States v. Giordano*, 416 U.S. 505, 515 (1974)). Specifically, as explained in the affidavit, the way the Target Subjects allegedly conducted activities related to the DTO, including the use of various known and unknown locations, the use of rental cars, and the close membership and association of the Target Subjects, combined with concerns about the long-term usefulness of CS-1, made many of the alternative investigative techniques such as trash pulls, physical surveillance, and infiltration of undercover officers, dangerous, difficult, or impossible.  In addition, the affidavit states that law enforcement would have been unable to discover the full scope of the alleged conspiracy, and to achieve the goals of the investigation into the DTO, without the wiretaps.

As previously detailed, in discussing physical surveillance, Officer Mynatt explains that law enforcement attempted physical surveillance on multiple occasions, but with little success.  He describes the use of the pole camera outside of 6632 Wachese Lane and its limited success given

19

that the residence is located on a dead-end street and vehicles are parked in the rear of the residence, out of the camera's view. Additionally, he notes that the distance of the camera makes it difficult to positively identify subjects at the residence and that tag information obtained from several observed vehicles has been related to rental vehicles. He further observes that the pole camera has never detected trash being discarded from the residence.

As to the other residences mentioned in the affidavit, Officer Mynatt discusses that agents have observed surveillance cameras on the outside of 603 Tate Street, a place where drugs have been obtained from the DTO, and therefore investigative methods, such as collecting trash, would be noticed and likely alert DTO members to the investigation. With respect to 4235 Plummer Road, Officer Mynatt states that it is unlikely that any useful evidence would be found at that residence, because Defendant Whittenberg has taken steps to separate that particular location from the illegal activity. He adds that based on his training and experience, any examination from a trash pull would not likely reveal the scope of the overall DTO or provide information about its drug suppliers or distributors.

The affidavit further explains how the goals of the investigation could not be achieved through the use of other surveillance techniques due to the way in which the Target Subjects conduct drug transactions—out of sight behind a residence or in a densely populated parking lot of a business—making surveillance difficult. It also discusses that the Target Subjects had been observed operating different vehicles, including rental cars and vehicles registered to other people, so that any derived value from the use of vehicle tracking devices was outweighed by the risk of detection. The affidavit further notes that the use of GPS information for cellular phones was considered to be of value in the investigation, but explains it would be most valuable when used

in conjunction with wiretap information indicating when a drug transaction will occur so that agents are able to physically surveil the transaction.

While CS-1 had been successful in making controlled buys from various Target Subjects, including Defendants, Officer Mynatt explains that he would not be able to successfully introduce a UCA to the Target Subjects to do anything more than make additional controlled drug buys because of the close membership and association of the Gangster Disciple Street Gang. Moreover, he believes that efforts to use a UCA to obtain information about the DTO's structure and activities would be too dangerous because the UCA would likely be requested to perform illegal activities such as participating in drug trafficking and money laundering.

Officer Mynatt's affidavit addresses the insufficiency of search warrants as a feasible alternative to a wiretap, noting the DTO's transient nature of operations and stating that the identities of the sources of supply and locations of stash houses were still unknown. He adds however, that it is his belief that wiretap information will assist in making the identifications and that the use of search warrants will then have greater success in dismantling the DTO. Officer Mynatt notes that grand jury investigation was not a feasible alternative at that point either, because attempted interviews and service of grand jury subpoenas upon those involved in the DTO would risk compromising the investigation.

Finally, Officer Mynatt details that the pen registers/trap and trace and toll information had been and would continue to be used, although it had not led to the identities of all persons involved in the calls. He also stated that a financial investigation was in the works but that not all DTO members were identified and it appeared they were operating on a cash basis. Officer Mynatt concludes that a mail cover request would not be of value as the investigation had not uncovered any indication that the DTO used mail to conduct drug trafficking or other criminal business.

21

All of the above discussed information in the affidavit shows that law enforcement gave "serious consideration to the non-wiretap techniques prior to applying for wiretap authority," explains the extent to which the Government utilized the alternative methods, and informs the Court regarding reasons the non-wiretap techniques had been or were believed to be inadequate. *See United States v. Alfano*, 838 F.2d 158, 163-64 (6th Cir. 1988). This is all that the law requires. *See id.* Contrary to the contentions of Defendants, including that the affidavit used generalized and conclusory language on necessity, there is sufficient information set forth by Officer Mynatt to comply with the necessity requirements of Title III. *See* 18 U.S.C. § 2518(1)(c). An affidavit's partial reliance on "'statements that would be equally applicable to almost any . . . case [of this kind] does not render the affidavit insufficient' so long as there is 'information about particular facts . . . which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation.'" *Wright*, 635 F. App'x at 167 (quoting *Landmesser*, 553 F.2d at 20) (omissions and alteration in original).

While Defendant Cornelius argues that Officer Mynatt's opinions on the ineffectiveness of certain non-wiretap techniques such as undercover agents, search warrants, interviews, grand jury subpoenas, immunity, trash searches, covert surveillance cameras, tracking devices, cell phone location information, financial investigations, and mail cover requests are not corroborated, this is not the standard by which the necessity requirement is reviewed. [Doc. 243 at 3]. "Title III's necessity provision requires 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Wright*, 635 F. App'x at 172 (quoting 18 U.S.C. § 2518(1)(c)). Defendant fails to cite to any supporting authority requiring corroboration of the affiant's opinion regarding the ineffectiveness of the non-wiretap techniques. Officer Mynatt detailed how these

22

non-wiretap techniques were either determined insufficient to accomplish the goals of the investigation or too risky to the investigation as a whole.

As the Sixth Circuit has instructed, the Court need not conduct "a hyper-technical and speculative analysis" of whether other investigative techniques might have been effective, but instead should examine the affidavit using "a practical and common sense" approach. *Id.* at 167-68 (quoting *United States v. Branch*, No. 5:12 CR 286, 2013 U.S. Dist. LEXIS 39817, at *33 (N.D. Ohio Mar. 13, 2013)). In so doing, the Court may rely on the affiant's opinions, based on his experience, that those techniques were "unlikely to succeed if tried." *Id.* at 167 (quoting *Landmesser*, 553 F.2d at 20). Accordingly, the Court finds that the affidavit provided as the basis for the Title III wiretap application contained "a full and complete statement as to whether or not other investigative procedures have been tried and filed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," satisfying the necessity requirement of 18 U.S.C. § 2518(1)(c). The wiretap order signed by District Judge Varlan is presumed proper, and Defendants have not satisfied their burden of overcoming this presumption.

## B. Material Misstatements/Omissions

At the motion hearing, Defendant Cornelius argued that in challenging the necessity requirement, he would need to introduce the testimony of Officer Mynatt in order for the Court to know whether there was a full and complete statement in regards to the investigative procedures that were used or not used. *See* [Doc. 288 at 5].[9] In essence, Defendant requests this Court to hold a *Franks*-like hearing. Discussing *Franks*, the Sixth Circuit in *Stewart* explains as follows:

---

[9] During the hearing, Attorney Wallace stated that Defendant Whittenberg was similarly situated to Defendant Cornelius (while distinguishing that a pen register trap and trace order was entered regarding Defendant Whittenberg) and also sought to challenge the "necessity" of the wiretap and the alleged general explanations for why other investigative techniques could not be performed. The Court notes that Defendant Whittenberg did not specifically address Defendant

The Supreme Court recognizes a defendant's right to challenge the sufficiency of a previously issued and executed warrant by attacking the statements made in an affidavit in support of the warrant. In order to obtain a hearing, the defendant must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit. If the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. The defendant must specifically point to the disputed portions of the challenged affidavit, and must support these charges with an offer of proof. If the defendant meets this burden, the court must then reconsider the affidavit without the disputed portions and determine whether probable cause still exists. If probable cause does not exist, the court must hold a full evidentiary hearing to determine whether the affidavit was properly submitted.

*United States v. Stewart*, 306 F.3d 295, 304-05 (6th Cir. 2002) (internal citations omitted).

The Sixth Circuit has applied the *Franks* doctrine to situations where defendants challenge a wiretap order on the basis that necessity has not been shown and requested an evidentiary hearing to determine the veracity of the agent's statements contained in the supporting affidavit. *United States v. Giacalone,* 853 F.2d 470, 473-76 (6th Cir. 1988); *see also Stewart,* 306 F.3d. at 304-06. In this context, "the *Franks* analysis changes slightly to require the defendant to show that the necessity requirement would not have been met absent the challenged statements or omissions." *United States v. Bennett*, No. 3:17-cr-32-DJH, 2017 WL 5339905 at *5 (W.D. KY Nov. 13, 2017) (citing *Kelley*, 596 F. Supp. 2d at).

In his motion, Defendant Cornelius argues that the affidavit contains misleading statements as to the physical surveillance conducted in this case. He points to the only physical surveillance described in the affidavit being the use of a single pole camera outside of 6632 Wachese Lane and argues that the affidavit failed to explain why continued use of the pole camera and physical surveillance would not produce useful information and claims that the affidavit misleads the

---

Cornelius's challenge to the allegedly misleading statements concerning the physical surveillance conducted in the investigation, including any physical surveillance of Defendant Whittenberg, but in any event, the same analysis applies.

issuing judge to believe agents had conducted physical surveillance of him (Defendant Cornelius). Upon questioning by the Court at the hearing, Defendant Cornelius clarified that he sought to go beyond the four corners of the affidavit and obtain evidence from Officer Mynatt to determine the accuracy of his statements concerning other investigative procedures and whether they were "simply unavailable or perhaps dangerous to employ." He urged the Court to allow him the opportunity "to be able to speak to the agent, to be able to ask him questions under oath to verify, did you provide a complete and accurate statement; did you fulfill the necessity requirement."

In further response to questioning by the Court, Defendant Cornelius acknowledged that he was required to show some misstatement or falsity in the affidavit but argued the only means to fulfill that burden would be to cross-examine and ask questions of the agent. Much like the defendants in *United States v. Bussell*, No. 3:10-cr-159, 2011 WL 6291799 (E.D. Tenn. 2011), Defendant Cornelius presented no evidence to support his allegations that Officer Mynatt's statements were misleading, but requests "an evidentiary hearing with testimony about the investigative techniques and their products . . . because they argue that the Court should consider this evidence outside of the contents of the affidavits in making a fully informed determination as to whether the affidavits included 'full and complete statement[s] as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Id.* at *9 (quoting 18 U.S.C. § 2518(1)(c)). In *Bussell*, this Court declined to allow such a hearing, finding that the district judge was in the best position to review the totality of the circumstances as they appeared at the time of the wiretap application.

Similarly, the undersigned finds that Defendant Cornelius's argument fails at the outset because he offers no proof that Officer Mynatt made a misleading statement in the affidavit. *See United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (explaining that a defendant requesting

a *Franks* hearing must support his allegations with "an offer of proof"). Defendant provides no more than a conclusory argument that the information concerning physical surveillance was misleading because a single pole camera outside of 6632 Wachese Lane was used and the affidavit purportedly failed to explain why continued use of the pole camera and physical surveillance would not be produce useful information. The Court rejects this argument as it has specifically detailed Officer Mynatt's discussion of the limited usefulness of the pole camera as well as his explanation and reasoning as to why other types of physical surveillance would be ineffective.

The Court also rejects Defendant Cornelius's argument that the issuing judge would have been misled to believe that actual physical surveillance was conducted of him (Defendant Cornelius), when "the only basis for requesting the wiretap of Mr. Cornelius was the CS-1." [Doc. 243 at 4]. First, the Court notes that in *United States v. Wright*, the Sixth Circuit held "that necessity must be shown only for the investigation as a whole, not for each interceptee or target." 635 F. App'x 162, 172 (6th Cir. 2015). Defendant Cornelius asserts that the "CS-1 had limited interactions with [him] compared to the other targets," and "with only limited evidence from the CS-1 and pen registers, the government improperly used the wiretap at the true first step in its investigation against [him]." [*Id.*]. Such is not borne out by the Court's review of the affidavit and, in any event, does not rise to the level of "a strong preliminary showing" of "an intention to mislead." *See Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998); *United States v. Warren*, No. 1:15-CR-32-HSM-SKL, 2015 WL 13735393, at *4 (E.D. Tenn. July 21, 2015) ("Regarding the false impression created, Defendant has submitted no argument or authority to support any claim that a false impression is the equivalent of a false affirmative statement."), *report and recommendation adopted by*, 2016 WL 158528 (E.D. Tenn. Jan. 13, 2016).

Defendant Cornelius cites to *United States v. Rice*, 478 F.3d 704, 710-11 (6th Cir. 2007), to claim that misleading statements in the affidavit similarly misled the issuing judge to believe that physical surveillance of him had been conducted. [Doc. 243 at 3]. In *Rice*, the affiant agent testified at the suppression hearing and answered questions related to his investigation of the case prior to the wiretap application—including that no physical surveillance had been conducted of the defendant. 478 F.3d at 708. A review of the docket in the Western District of Kentucky from *Rice*, including the District Judge's opinion on the motion to suppress, notes that the affiant agent testified at the hearing on the motion to suppress. *See United States v. Rice et al.*, No. 3:04-cr-083-TBR-DW (W.D. Ky. October 13, 2005) [Doc. 303]. However, in the government's post-hearing response brief to the motion to suppress in *Rice*, the government stated that "despite the absence of any preliminary showing by the defendants, [the Court] granted a hearing on this issue over the objection of the United States." *United States v. Rice et al.*, No. 3:04-cr-083-TBR-DW (W.D. Ky. August 22, 2005) [Doc. 289].

When addressing the defendant's request for the affiant agent to testify in *Bussell*, Magistrate Judge Shirley discussed *Rice* and noted that "[t]he Sixth Circuit opinion in *Rice*, however, does not discuss any issues related to whether the agent's testimony on those matters should have been allowed or required or even indicate that either party challenged the fact that he was testifying." *United States v. Bussell*, No. 3:10-CR-159, 2011 WL 6291799, at *7 n.4 (E.D. Tenn. Nov. 10, 2011), *report and recommendation adopted by*, 2011 WL 6258827 (E.D. Tenn. Dec. 15, 2011). Therefore, Magistrate Judge Shirley stated that "while *Rice* stands as an example that such evidence outside of the four corners of the affidavit has been considered by district courts in the Sixth Circuit, the Court finds that *Rice* provides no framework for analyzing whether and when evidentiary hearings as to necessity of wiretaps should or may be held." *Id.*

27

While Defendant Cornelius claims that the affidavit in the present case involved misleading statements, *Rice* is ultimately distinguishable and does not support his request for Officer Mynatt to testify. As detailed above, the affiant agent in *Rice* testified at the suppression hearing prior to any determination regarding whether a misleading statement was made in the affidavit or the intent of the officer. In *Rice*, the affidavit at issue broadly stated that "[a]ll normal avenues of investigation have been carefully evaluated for use or have been attempted with minimal results," including stating that "[t]he traditional investigative techniques utilized thus far have included . . . physical surveillance" and that "[p]hysical surveillance of the subjects of this investigation has been conducted and is presently being conducted with only limited success." 478 F.3d 704, 707 (6th Cir. 2007) (citation omitted). Additionally, the affidavit stated that the risk of conducting physical surveillance existed due to the fact that members of the criminal organization with violent criminal histories routinely carried firearms. *Id.* The district judge found that an issuing judge would mistakenly believe that law enforcement had conducted physical surveillance on the defendant and his associates. *Id.* Lastly, "the later testimony of Wenther [the affiant agent] at the suppression hearing revealed that agents had not conducted any physical surveillance on Rice and that they had no specific information on whether Rice carried a firearm." *Id.*

However, in the present case, Officer Mynatt's affidavit includes specific information about the physical surveillance conducted through the pole camera at 6632 Wachese Lane. Officer Mynatt also stated that physical surveillance was difficult due to the DTO's use of various locations, and the fact that the 6632 Wachese Lane address is located at the end of a dead-end street. Officer Mynatt provided several additional reasons why physical surveillance would not ultimately be effective, including the DTO's use of rental cars. Additionally, Officer Mynatt averred that physical surveillance would not allow law enforcement to conclusively establish the

28

identities of the co-conspirators, as a more effective technique would be targeted physical surveillance coordinated with wire and electronic interceptions. [Doc. 243-1 at 60-62].

Therefore, unlike in *Rice*, the affidavit reviewed the investigative efforts in great detail and provided specific examples of the actual physical surveillance conducted, as well as the reasons why surveillance would be ineffective, tied to the actions of the particular DTO. The affidavit also did not claim that physical surveillance would be ineffective because of an improper inference about Defendant Cornelius (for example, that he was armed and thus surveillance would be dangerous), as in *Rice*. Additionally, contrary to Defendant Cornelius's argument, the affidavit explained why physical surveillance at the 6632 Wachese Lane address would not produce useful information.

Furthermore, even if Defendant Cornelius had offered proof that Officer Mynatt presented misleading statements in the affidavit, his request for a *Franks* hearing would still be insufficient because he has not demonstrated that Officer Mynatt intentionally misled the Court. *See Mays*, 134 F.3d at 816; *see, e.g.*, *United States v. Sims*, 508 F. App'x 452, 459 (6th Cir. 2012) ("Moreover, even if some of them were misleading, Sims has not shown that the other elements of the preliminary showing necessary for a *Franks* hearing are present; [including that] there is no evidence that Agent Fitzgerald made a false statement 'knowingly and intentionally' . . . ."); *Bennett*, 2017 WL 5339905, at *6 ("Even if Bennett had presented proof of the alleged omissions, his request for a *Franks* hearing would still be insufficient, because he has not demonstrated that Mehall omitted the information because of an intent to misrepresent the facts or mislead the Court."); *Warren*, 2015 WL 13735393, at *4 ("Even if the creation of a false impression were considered sufficient, however, Defendant has made no showing that any false impression was

29

created knowingly and intentionally or with reckless disregard for the truth.").  Accordingly, for

these reasons, the Court concludes that Defendant Cornelius is not entitled to a *Franks* hearing.

## III.     CONCLUSION

Accordingly, the undersigned respectfully **RECOMMENDS**[10] that:

1.     Defendant Whittenberg's Motion to Adopt Motion to Suppress Intercepted
       Communications by Wiretap [**Doc. 247**] be **GRANTED**; and

2.     Defendant Cornelius's Motion to Suppress Intercepted Communications by
       Wiretap [**Doc. 242**] be **DENIED**.

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[10] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

30